UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DAVID REYNOSO,

           Plaintiff,

-against-

CLEMENCE TOUSSON,

           Defendant.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
14-CV-3564 (CBA) (JO)

**AMON, United States District Judge:**

Plaintiff David Reynoso filed this defamation suit against Clemence Tousson, his former business associate, alleging that she published or caused to be published a series of defamatory statements online that disparaged Reynoso's business practices. (D.E. # 9 ("Am. Compl.") ¶¶ 1, 16–37.) Tousson, then represented by counsel, removed the action to this Court on diversity grounds. (D.E. # 1.) Tousson filed a counterclaim for breach of contract based on Reynoso's failure to pay Tousson the balance on two promissory notes they executed as part of their business dealings. (D.E # 26 ("Answer and Counterclaim") at 12–17.) Tousson, now proceeding pro se, moves for summary judgment dismissing Reynoso's defamation claims and granting judgment in her favor on her breach of contract counterclaim. (D.E. # 50 ("Def. Mem.").) Reynoso contends that genuine disputes of fact preclude summary judgment. (D.E. # 52 ("Pl. Opp'n").) For the reasons that follow, Tousson's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

In or around 2002, Reynoso and Tousson began a business relationship.[1] (D.E. # 52-2 ("Tousson Dep.") at 16:3–19:7; D.E. # 52-1 ("Reynoso Dep.") at 9:15–10:14.) Reynoso attested

---

[1] Tousson did not submit a statement of material facts pursuant to Local Rule 56.1. "Although noncompliance with Rule 56.1(a) is a valid basis to deny a summary judgment motion in this district, the court has discretion 'to overlook

1

that Tousson was an investor or lender involved in a number of his companies—including DL Rothstein, Still Green and Growing, Brook Valley Investments, and Portfin Management—none of which are still in operation. (Reynoso Dep. at 9:15–22:25, 70:6–9.) By contrast, Tousson said she had limited familiarity with some of these companies; in particular, she had "nothing to do with Brook Valley Investments" and did not really know "who or what" DL Rothstein was. (Tousson Dep. at 16:3–17:19.) Instead, Tousson said she made an original investment in Portfin Management, but Reynoso "[took] a lot of my money by telling me that if I gave him more, I would get my original funds back from Portfin Management. The only investment I ever made was in Portfin Management." (Tousson Dep. at 16:23–18:13.)

In the course of their relationship, the parties executed two promissory notes, with DL Rothstein (owned by Reynoso) as "Maker" and Tousson as "Payee." (Def. Mem. at Ex. 1; see also Tousson Dep. at 55:2–57:5; Reynoso Dep. at 70:23–24.) The first note was for $184,915.60 (the "First Note") and the second note was for $245,000 (the "Second Note"). (Def. Mem. at Ex. 1.) Tousson wanted "her funds converted from an investment into a promissory note," (Reynoso Dep. at 12:6–7), and the promissory notes "consolidate[d] everything that went on over the years," (Tousson Dep. at 56:14–15). Reynoso "obliged" because it made sense as a business decision, since "the rate of return on the promissory note was less than what we would have ended up paying as an investment." (Reynoso Dep. at 12:6–13:9; see also id. at 46:11–18 (explaining that the Second Note was drafted at Tousson's request and represented the "sum total of the number of years we had done business").) Although both promissory notes are dated "April 2 2002," the

---

a party's failure to comply with local court rules.'" Goldstein v. Solucorp Indus., Ltd., No. 11-CV-6227 (VB), 2015 WL 6143813, at *4 (S.D.N.Y. Oct. 16, 2015) (citation omitted) (quoting Holtz v. Rockefeller, 258 F.3d 62, 73 (2d Cir. 2001)) (adopting Report & Recommendation). In light of Tousson's pro se status, the Court overlooks Tousson's omission.

contracts were in fact executed in June 2012—the same month on which the sums were deemed due. (Def. Mem. at Ex. 1; Tousson Dep. at 55:2–56:12.)

Under the First Note, "FOR VALUE RECEIVED," DL Rothstein:

> hereby covenants and promises to pay Clemence Tousson . . . ONE HUNDRED EIGHTY FOUR THOUSAND NINE HUNDRED FIFTEEN DOLLARS AND 60/00 lawful money of the United States of America, together with interest thereon computed from October 2002 until JUNE 2012, at the rate of 10 percent per annum, of which interest and principal payment payable on JUNE 2012, on which date all outstanding principal shall then be due and payable.

(Def. Mem. at Ex. 1.) The First Note further provides that if the Payee "must take any action to enforce its rights hereunder, Payee shall be entitled to recover all costs incurred, including reasonable attorney's fees." (Id.) It also provides that the agreement "shall be personally guaranteed by David Reynoso." (Id.) Under the Second Note, "FOR VALUE RECEIVED," DL Rothstein:

> hereby covenants and promises to pay to Clemence Tousson . . . TWO HUNDRED FORTY FIVE THOUSAND DOLLARS AND 00/100 lawful money of the United States of America, together with interest thereon computed from October 2002 until JUNE 2012, at the rate of 10 percent per annum, of which interest and principal payment payable on JUNE 2012, on which date all outstanding principal shall then be due and payable.

(Id.) The Second Note makes the same guarantees as the First Note. (Id.)

The parties dispute whether Tousson received any genuine payments on the promissory notes. When asked whether she received approximately $44,818 in payments from Reynoso between June 18, 2012 and November 2013, Tousson said, "That sounds about right." (Tousson Dep. at 54:14–17.) She said the payments were "sporadic," (id. at 57:9–16), and took the form of wire transfers into her Wells Fargo account, (id. at 54:22–24). But Tousson also believes the payments were not genuine: "It came to my attention that various lines of credit and credit cards were open in my name, so the payments that were supposedly paid to me, to my knowledge, it seemed like it was money that I was responsible for due to the lines of credit open in my name."

3

(Tousson Dep. at 20:22–21:4.) When asked whether he or anyone affiliated with any of his companies ever opened a credit card or a credit line in Tousson's name, Reynoso responded "[n]ever" and "[a]bsolutely not." (Reynoso Dep. at 67:12–68:6.) According to Reynoso, payments were derived from "[p]rofit sharing" from various businesses. (Reynoso Dep. at 51:16–21.) In March 2014, Tousson filed a report alleging that she had been the victim of identity theft and fraud with the City of Galveston Police Department. (Def. Mem. Ex. 3.)

Around February 1, 2014, Tousson contracted with non-party Clients First LLC ("Clients First")—which she described as a "victim advocacy group"—in order to try to collect unpaid funds from Reynoso. (Tousson Dep. at 25:19–26:15; Def. Mem. at Ex. 4.) The contract agreement explains that Clients First "will implement . . . a comprehensive and immediate strategy for recovery of the Client's misappropriated assets" and will use its "best professional judgment." (Def. Mem. at Ex. 4.) The contract agreement further indicates that "[Clients First] will be responsible for all work performed." (Id.) Tousson's primary contact at Clients First was Jack Baugher, (Tousson Dep. 26:13–15), and she also dealt with employee James Rider, (id. at 33:3–6). Baugher instructed her to "write a list of what happened to [her] or a letter of what happened to [her]." (Tousson Dep. at 26:13–27:10.) Tousson did so and "everything [she] wrote in there was truthful." (Tousson Dep. at 27:8–12.) But Tousson was "not supposed to ask about [Baugher's] tactics," "mention his name," or mention his company's name, which "sounded a little bit shady" and "brought up a red flag." (Tousson Dep. at 26:13–27:12.)

The Amended Complaint identifies eleven defamatory statements about Reynoso that were ultimately published on websites such as "victimadvocates.net," "www.ripoffrepairs.com," "www.equalizergroup.org," and "fraudandscam.com." (D.E. # 9-1 ("Ex. A").)

> (1) Reynoso is "a small time crook, who has ripped off tens of thousands and made up a lot of lies as well as scams regarding his various cons he has pulled." (Ex. A at 6.)

(2) "He [Reynoso] will not think twice about taking it [money] and will rip you off. This is a true fact." (Ex. A at 6.)

(3) Reynoso is "known for ripping off women." (Ex. A at 6.)

(4) "He [Reynoso] has committed credit card fraud and ripping off women from around the U.S." (Ex. A at 6.)

(5) "David Reynoso has committed credit card fraud and other crimes." (Ex. A at 12.)

(6) The defendant was "conned into sending [Reynoso] $25,000.00" and "the other con was for $35,000.00." (Ex. A at 1.)

(7) The defendant was "conned into sending $65,000 to start Still Green and Growing." (Ex. A at 1.)

(8) "$15,000.00 on August 7, 2008 when he was in a serious jam for money he owed others." (Ex. A at 2.)

(9) Reynoso "charged $3,700 on my Chase Card, which was automatically deducted from my checking account. Then he went on to run up more than $10,000 which I was responsible for (on my record)." (Ex. A at 2.)

(10) "He [Reynoso] also charged $3,823.25 on my Discover Card which was also automatically deducted from my checking account." (Ex. A at 2.)

(11) "Reynoso talked me into withdrawing $37,950.00 from my retirement account" and it was "money David Reynoso put in his pocket." (Ex. A at 2.)

The parties appear to agree that the challenged statements are derived, at least in part, from the information Tousson communicated to Clients First. Tousson explained: "'Conned' is not the word I used. The amounts are accurate. I reported the amounts that were passed along over the year. But I did not use the word 'conned.'" (Tousson Dep. at 45:15–22.) At Reynoso's deposition, he discussed documents apparently showing that funds were exchanged in amounts matching those mentioned in the Internet postings—in particular, a $25,000 "bridge loan" and sum of $65,000—but neither party has provided those documents to the Court. (See Reynoso Dep. at 56:14–58:15.)

The parties disagree about the extent of Tousson's involvement in the Internet postings. Tousson's deposition testimony as to whether she reviewed the postings in advance was somewhat inconsistent. When asked whether she reviewed any of Baugher's content, she said: "No. I didn't

5

know—not know he was going to put them all over the Internet. And definitely not in that language. It's not the way I would write. He used the word 'conned' over and over again." (Tousson Dep. at 27:13–20.) When asked again whether she reviewed representations by Baugher or Rider before they were disseminated, she neither admitted nor denied it and said:

> This was later on, and I told him I didn't speak that way. I didn't like the wording. All I can say is what happened to me. This thing about millions of women, I don't know about. What happened to other people—I only know what happened to me. A lot of it was just so wordy and almost bullying tactics. I told him I didn't like it. . . . Again, this is not the language I would use."

(Id. at 33:3–22.) And when asked later how she responded when Baugher provided her with certain language prior to releasing it to any third party, she said she responded, "I told him I didn't like it." (Id. at 33:23–34:5.) Finally, when counsel asked her to confirm whether Clients First LLC sent her language prior to them releasing it to a third party, Tousson said: "I have no idea where they were going to release it or how they were going to release it. But he asked me to look it over—even though he asked me to look it over, any time I said that I objected to something, he said he didn't want to change it." (Id. at 41:13–21.) She also explained that she thought the statements would be sent "[j]ust to Mr. Reynoso." (Id. at 42:21–23.) And even though Tousson admitted she thought Clients First told her to look online, she was not "Internet-savvy" and did not attempt to look for the statements on the Internet. (Id. at 42:25–43:22.) Reynoso further discussed a number of emails between her and Clients First—but again, neither party provided these emails to the Court. (See, e.g., id. at 30:6–31:13, 51:8–54:13.)

When Tousson objected to the content, Clients First told her to "go with what it is" or pay a fee for breaking her contract, so she "felt like it was out of [her] control." (Id. at 33:23–34:10.) She further explained that Baugher told her "he's been doing this type of stuff for years and these strategies are the ones that work and [she] shouldn't argue with him." (Id. at 44:20–45:8.) When

6

asked whether she allowed him to continue these strategies, Tousson reiterated, "I felt like I was in a bind, because if I broke the contract, I would have to pay the fee because it was less than six months." (Id. at 45:9–13.) She was eventually contacted by Reynoso's attorneys about the statements, who threatened to file suit. (Id. at 31:18–32:9.) Tousson then explained: "[W]hen I asked Jack Baugher to take down the postings, he refused. He told me he already had some other clients coming forward and that he would not take down the postings." (Id. at 32:9–13.) Tousson ultimately terminated Clients First's services when it threatened to sue Tousson. (Id. at 41:25–42:4.)

Reynoso said he first learned about the Internet postings when he was "contacted by an individual on behalf of Ms. Tousson indicating that he represented her." (Reynoso Dep. at 5:5–9.) The individual, "Jack Baugher or Jeff or something," called Reynoso from a blocked number and said "in a condescending fashion, you know, I gave you a golden opportunity to resolve this issue and you didn't; go look up your name online and have fun." (Id. at 5:13–23.) Reynoso became concerned by Baugher's threatening tone. (Id. at 6:18–7:25.) After the Internet postings, Reynoso testified he lost business and suffered reputational harm. (Id. at 43:13–44:3.) He explained that he repeatedly heard from prospective employers, "We did a search on you online and we see that . . . you have some very serious problems, and we would rather you deal with those problems before we would explore the possibility of hiring you further." (Id. at 44:4–12.) Reynoso said he was "unemployable right now because every time a search is conducted on me, the doors get shut instantly." (Id. at 44:13–18.)

Tousson testified that she received her last payment from Reynoso "about six months" before she contacted Clients First. (Tousson Dep. at 58:14–18.) Reynoso testified at his deposition that he "never stopped" making payments on the promissory notes until he began receiving calls

from Baugher. (Reynoso Dep. at 48:4–19, 49:4–7.) At that point, "per my attorney's advice, I stopped." (Id. at 48:13–19.) When asked whether he acknowledged that there was still a balance due on the promissory notes, Reynoso said, "Yes, of course." (Id. at 54:18–20.)

On or about May 2, 2014, Reynoso commenced the instant action. (D.E. # 1-1.) On June 6, 2014, Tousson removed the action to federal court. (D.E. # 1.) On October 18, 2018, Tousson moved for summary judgment. (Def. Mem.) The case was transferred to this Court on April 23, 2019.

## STANDARD OF REVIEW

As an initial matter, both parties contend that this Court should apply New York state procedural law: Tousson argues that N.Y. C.P.L.R. § 3213 applies, (Def. Mem. at 3), and Reynoso confusingly argues that N.Y. C.P.L.R. § 3212 applies but that the Court "should consider" the standard under Federal Rule of Civil Procedure 56, (Pl. Opp'n ¶ 7). However, "[u]nder the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996). Because the summary judgment standard is procedural, Rule 56 alone governs. See, e.g., Allianz Ins. Co. v. Lerner, 416 F.3d 109, 118 (2d Cir. 2005) ("New York state procedural rules do not apply here to a federal court sitting in diversity."); All Am. Tel. Co., Inc. v. AT & T Corp., 328 F. Supp. 3d 342, 354 (S.D.N.Y. 2018) ("CPLR § 3212 and the New York case authority interpreting and applying that standard do not apply" when evaluating summary judgment motions.)

A court grants summary judgment under Rule 56 only when, "construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in [his] favor," Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108 (2d Cir. 2013), "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law," id. (quoting Fed. R. Civ. P. 56(a)). Because the "principles governing admissibility of evidence do not change" at this stage, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 264 (2d Cir. 2009) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 65–66 (2d Cir. 1977)). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

Because Tousson appears pro se, the Court construes her submissions liberally to raise the strongest arguments they suggest, Warren v. Colvin, 744 F.3d 841, 843 (2d Cir. 2014), and "examine[s] every claim or defense with a view to determining whether summary judgment is legally and factually appropriate," Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014).

## DISCUSSION

Tousson moves for summary judgment dismissing Reynoso's defamation claims and granting judgment in her favor on her breach of contract counterclaim. Reynoso argues that there are genuine disputes of material fact that preclude summary judgment on both claims.

### I. Defamation Claims

"Defamation, consisting of the twin torts of libel and slander, is the invasion of the interest in a reputation and good name." Albert v. Loksen, 239 F.3d 256, 265 (2d Cir. 2001) (citation omitted). "Generally, spoken defamatory words are slander; written defamatory words are libel." Id. at 265. "The elements of a cause of action for defamation are a false statement, published without privilege or authorization to a third party, constituting fault as judged by, at a minimum, a negligence standard, and it must either cause special harm or constitute defamation per se."

9

Kamchi v. Weissman, 1 N.Y.S.3d 169, 180 (2d Dep't 2014) (citation omitted); see also Lan Sang v. Ming Hai, 951 F. Supp. 2d 504, 517 (S.D.N.Y. 2013) (citation omitted) (same). "Since falsity is a necessary element of a defamation cause of action and only 'facts' are capable of being proven false, 'it follows that only statements alleging facts can properly be the subject of a defamation action.'" Gross v. New York Times Co., 623 N.E.2d 1163, 1167 (N.Y. 1993) (citation omitted). Thus, "expressions of an opinion 'false or not, libelous or not, are constitutionally protected and may not be the subject of private damage actions.'" Steinhilber v. Alphonse, 501 N.E.2d 550, 550 (N.Y. 1986) (citation omitted). In general, statements are defamatory per se if they "tend to injure the plaintiff in his or her trade, business or profession." Albert, 239 F.3d at 271.

Tousson argues that Reynoso cannot state a claim of defamation because (1) he did in fact default on the promissory notes, there is a "verifiable pattern of fraud across multiple states," and the Internet postings are verifiably accurate; (2) there is evidence of "no significant loss in [Reynoso's] earnings" during the period when Clients First published the statements; and (3) Tousson is the wrong party because Clients First is contractually responsible for the statements. (Def. Mem. at 3.)

Tousson's first argument amounts to a claim that the challenged statements are true. Because falsity is a required element, "[t]ruth provides a complete defense to defamation claims." Cain v. Atelier Esthetique Inst. of Esthetics Inc., 733 F. App'x 8, 11 (2d Cir. 2018) (citation omitted). The Court cannot determine, on this record, that any of the challenged statements are indisputably true.

The fact that Tousson filed a report of credit card fraud against Reynoso, (Def. Mem. at Ex. 3), and that others also filed complaints against him, (see, e.g., Def. Mem. at Ex. 8), does not establish the truth of the first five statements, which generally state that Reynoso "ripped off"

women and "committed credit card fraud and other crimes." And the Court cannot determine that the other six statements describing payments Tousson was persuaded to send to Reynoso are, in fact, accurate: the only evidence Tousson proffers is the Internet postings themselves—which are hearsay, when offered for the purpose of establishing that the statements are true—and her testimony that the amounts are accurate. Tousson has not proffered, for example, bank statements or other evidence of payments.

Tousson's second argument, that Reynoso has not been harmed by the challenged statements, is not persuasive. The challenged statements are defamatory <u>per se</u> because, by portraying Reynoso as a con artist, they "tend to injure the plaintiff in his . . . trade, business or profession." <u>Albert</u>, 239 F.3d at 271. Thus, "proof of special harm is unnecessary." <u>Id.</u>; see also <u>Kamchi</u>, 1 N.Y.S.3d at 182 (where statements would tend to injure plaintiff in his trade, business, or profession, "the plaintiffs were not required to allege or prove special damages, as the law presumes that damages will result"). Tousson argues that "affirmative evidence of no special harm . . . negates the <u>a priori</u> assumption of harm to Plaintiff," citing documents that apparently prove Reynoso was awarded government contracts after the statements were made. (Def. Reply at 8; Def. Mem. at Exs. 7g, 7h, 7i.) But the fact that Reynoso may have performed some work does not negate the possibility that he was deprived of other work based on reputational harm. The law presumes that Reynoso was damaged. And in any event, Reynoso has created at minimum a dispute of fact, because he specifically testified that he suffered damage to his business based on the challenged statements. (<u>See</u> Reynoso Dep. at 43:20–44:18.)

Tousson's third argument is that Clients First was responsible for the statements. Under New York's republication liability standard, as articulated by the Court of Appeals, "one who utters a slander, or prints and publishes a libel, is not responsible for its voluntary and unjustifiable

11

repetition, without his authority or request, by others over whom he has no control and who thereby make themselves liable to the person injured . . . ." Geraci v. Probst, 938 N.E.2d 917, 921 (N.Y. 2010) (citation omitted). The underlying principle is the "settled rule of law that no man is bound for the tortious act of another over whom he has not a master's power of control." Giuffre v. Maxwell, No. 15-CV-7433, 2017 WL 1536009, at *2 (S.D.N.Y. Apr. 27, 2017) (internal quotation marks omitted) (quoting Davis v. Costa-Gavras, 580 F. Supp. 1082, 1096 (S.D.N.Y. 1984)). At the same time, however, an individual may be held liable if she "intended and authorized the republication of the allegedly defamatory content." Levy v. Smith, 18 N.Y.S.3d 438, 439 (2d Dep't 2015); see also Restatement (Second) of Torts § 576 cmt. c (Am. Law Inst. 1977) ("If the repetition is authorized or intended by the originator of the defamation, he is liable for the harmful effects of the actions of the person or persons to whom the authorized or intended repetition is made."); id. § 577 cmt. f ("One is liable for the publication of defamation by a third person whom as his servant, agent or otherwise he directs or procures to publish defamatory matter.").

In this case, viewing the facts in the light most favorable to Reynoso, a reasonable jury could infer that Tousson "intended and authorized" the publication of the challenged statements. Levy, 18 N.Y.S.3d at 439. Tousson specifically contracted with Clients First to attempt to collect unpaid funds from Reynoso, she communicated her complaints about Reynoso to Clients First, and her deposition testimony could be interpreted to suggest that she reviewed the representations in advance of their dissemination. Tousson argues that she "felt like" the postings were "out of [her] control" because, if she objected, she would have had to pay a fee to terminate her contract with Clients First. (Tousson Dep. at 33:23–34:10.) But economic hardship does not mean that Tousson "ha[d] no control" over Clients First's publication decisions under agency principles. Geraci, 938 N.E.2d at 921 (citation omitted). Indeed, Tousson ultimately did terminate Clients

First's services when it threatened to sue her. (Tousson Dep. at 41:25–42:4.) Tousson also argues that Clients First refused to take the postings down. (Id. at 32:9–13.) But that does not conclusively prove that she did not "intend[] and authorize[]" their publication in the first instance. Levy, 18 N.Y.S.3d at 439. Tousson remains free to argue before a jury that she did not authorize and lacked control over the Internet postings. But the Court cannot conclude at this juncture that no reasonable jury would find in Reynoso's favor.

## II. Breach of Contract Claim

The "essential elements" of a breach of contract action under New York law are "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach." Dee v. Rakower, 976 N.Y.S.2d 470, 474 (2d Dep't 2013); see also Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank, 392 F.3d 520, 525 (2d Cir. 2004) ("To establish a prima facie case for breach of contract, a plaintiff must plead and prove: (1) the existence of a contract; (2) a breach of that contract; and (3) damages resulting from the breach.").

As to liability, Tousson has proffered undisputed evidence of (1) the existence of contracts (the two promissory notes), (2) her performance under those contracts (provision of funds) and Reynoso's breach of those contracts (his admitted failure to pay the balance on the notes), and (3) damages (the unpaid balances on the notes). (See Def. Mem. Ex. 1.) Reynoso does not dispute the existence or validity of the contract. (See, e.g., Reynoso Dep. at 45:19–50:14 (affirming that his notarized signature appears on both contracts).) He does not dispute that he received funds from Tousson and that he stopped making payments on the promissory notes. (See id. at 12:6–7 ("[Tousson] wanted her funds converted from an investment into a promissory note, and we obliged."); id. at 48:4–51:15 (explaining that he stopped making payments when he began receiving phone calls from Baugher).) And he does not dispute that there is an unpaid balance on

13

both promissory notes. (See id. at 54:18–20 ("Q: You acknowledge that still a balance is due under the promissory notes? A: Yes, of course.").)

Reynoso attested that he "withheld" payment when he began receiving threatening phone calls from Baugher, "per [his] attorney's advice." (Id. at 48:13–19, 50:25–51:6.) But Reynoso has not articulated any basis for why Baugher's phone calls relieved him from his duty to perform under the promissory notes. And although Reynoso listed eleven affirmative defenses in his answer to the counterclaim, (see D.E. # 29 ¶¶ 29–50), he has not asserted, let alone proffered evidence to support, any of these defenses on summary judgment.[2] (See generally Pl. Opp'n. ¶¶ 29–70.) Once Tousson came forward with sufficient evidence to establish Reynoso's breach of contract, Reynoso was obligated to "come forward with evidence that would be sufficient to support a jury verdict in his favor" as to liability. Goenaga, 51 F.3d at 18. He failed to do so. Reynoso argues that there are disputes about the parties' business relationship, which is the "bedrock foundation" for the counterclaim, (Pl. Opp'n ¶ 33), but it is not apparent why these disputes are material to the question of whether Reynoso failed to perform in accordance with the valid Promissory Notes. He also argues that there are disputes about the amount owed, but those are relevant to the amount, and not the existence, of damages. Accordingly, Reynoso is liable for breach of contract on the promissory notes as a matter of law.

However, the Court concludes that disputes of fact preclude summary judgment on the amount of damages. First, the parties dispute the calculation of interest and, consequently, the total sum owed. Tousson argues that interest accrual is ongoing, citing a provision in the

---

[2] The eleven affirmative defenses are (1) failure to state a claim, (2) lack of subject matter jurisdiction, (3) laches, (4) unclean hands, (5) documentary evidence barring the counterclaim, (6) failure to mitigate damages, (7) accord and satisfaction, (8) doctrine of offset, (9) unjust enrichment, (10) prevention of performance, (11) improper notice of breach. (D.E. # 29 ¶¶ 29–50.) At Reynoso's deposition, the attorneys discussed the tenth affirmative defense based on Tousson's refusal to accept payments. (See Reynoso Dep. at 53:7–25.) But no testimony on that subject was elicited from Reynoso, and of course, the attorneys' conversations are not evidence.

14

promissory notes providing that the notes "shall be extended at the discretion of the borrower who will in turn pay the lender a fee in advance of the extension year of 10% pr. year for each additional year of nonpayment of principal." (Def. Reply at 4; Def. Mem. at Ex. 1.) Reynoso argues that the contract only allows for interest computed from October 2002 until June 2012. (Pl. Opp'n ¶ 64.) Second, the record is unclear as to the amounts already paid, and the parties dispute whether any payments were genuine. When asked whether she received approximately $44,818 in payments from Reynoso between June 18, 2012 and November 2013, Tousson said, "That sounds about right." (Tousson Dep. at 54:14–17.) But she argues that the payments were derived from fraudulent lines of credit opened in her name and filed a police report alleging she had been the victim of identity theft and fraud. (Tousson Dep. at 20:22–21:4; Def. Mem. Ex. 3.) Reynoso could not recall how much he had paid on the notes. (Id. at 47:12–16, 50:19–21.) But he denied ever opening a credit card or credit line in Tousson's name and said the payments came from profit sharing from various businesses. (Reynoso Dep. at 67:12–68:6, 51:16–21.) Given the lack of clarity on the proper calculation of interest, the amounts already paid, and the validity of those payments, summary judgment on the amount of damages due to breach of contract is inappropriate.

## CONCLUSION

For these reasons, Tousson's motion for summary judgment dismissing Reynoso's defamation claims is denied. Her motion for summary judgment on her breach of contract counterclaim is granted as to liability and denied as to damages.

SO ORDERED.

Dated: September 12, 2019
      Brooklyn, New York

s/Carol Bagley Amon

Carol Bagley Amon
United States District Judge